**AMALGAMATED BUTCHER WORKMEN LOCAL UNION NO. 641, Plaintiff-Appellee,**

v.

**CAPITOL PACKING COMPANY, a Colorado corporation, Defendant-Appellant.**

**No. 70–68.**

United States Court of Appeals Tenth Circuit.

July 15, 1969.

Sheldon E. Friedman, Denver, Colo., (Stanton D. Rosenbaum, Denver, Colo., on the brief), for appellant.

Philip Hornbein, Jr., Denver, Colo., Roy O. Goldin, Denver, Colo., on the brief, for appellee.

Before MURRAH, Chief Judge, and PHILLIPS and SETH, Circuit Judges.

PHILLIPS, Circuit Judge.

Amalgamated Butcher Workmen Local Union No. 641[1] brought this action against Capitol Packing Company,[2] seeking specific performance of an arbitration award of pro rata vacation pay to certain of Capitol's employees. The award was made in an arbitration proceeding, under an arbitration provision in a collective bargaining contract, entered into by Capitol and the Union in behalf of Capitol's employees. By its terms, the contract ran for the period September 1, 1964, to December 1, 1967.

From a decree granting specific performance, Capitol has appealed.

Capitol operated a meat packing plant at Denver, Colorado. On August 11, 1967, it laid off approximately two-thirds of its employees in the bargaining unit covered by the contract. On August 18, 1967, it laid off the remainder of its employees in such unit.

On or before November 18, 1967, Capitol advised its employees that its plant was closed down and that it had no plans to reopen it.

A controversy arose between Capitol and the Union as to whether certain of the employees in the bargaining unit were entitled to pro rata vacation pay. Those employees made up a class of employees, the employment anniversary date of whom for the current year of their employment was subsequent to the date they were laid off. In a letter to the Union, dated October 19, 1967, Capitol said, "we are not paying vacation for Donato Lucero since his anniversary date is September 15, which was after the plant closing." It took a like position as to other employees in such class.

Article 28 of the 1964–1967 contract, in part here material reads:

"ARTICLE 28

"VACATIONS. All regular full-time employees covered by this Agreement who have been in the continuous service of the Employer for a period of one (1) year shall be entitled to a vacation of one (1) week with pay. All regular full-time employees who have been in the continuous service of the

---

1. Hereinafter called the Union.

2. Hereinafter called Capitol.

Employer for a period of three (3) years shall be entitled to a vacation of two (2) weeks with pay. All regular full-time employees who have been in the continuous service of the Employer for a period of ten (10) years shall be entitled to a vacation of three (3) weeks with pay. All regular full-time employees who have been in the continuous service of the Employer for a period of twenty-five (25) years shall be entitled to a vacation of four (4) weeks with pay."

The employees in such class of the Union contended that since they did not discontinue their services with Capitol voluntarily and were not discharged by it for cause but ceased rendering services to Capitol only because it discontinued and did not resume operation of its plant, they were entitled to vacations with pay for that proportion of the length of their annual vacation time,[3] which the time of their services during the current year bore to one year.

Article 10 of the 1964–1967 contract, in part here material, reads:

## "ARTICLE 10

"ARBITRATION. Grievances not satisfactorily settled in Steps (a), (b), or (c) above and any *dispute, disagreement or controversy concerning the interpretation or application of this Agreement may be submitted to arbitration upon the request of either party.* The Employer and the Union shall, within five (5) working days after such notice of request to arbitrate, select an impartial arbitrator to hear and determine the matter in dispute, and the award of such impartial arbitrator shall be final and binding upon the parties. (Italics ours.)

\* \* \* \* \* \*

"The arbitrator shall not have the power to add to, subtract from, or modify any of the terms of this Agreement."

The parties, being unable to resolve their dispute with respect to pro rata vacation pay, agreed to submit the matter for arbitration to John Phillip Linn, in accordance with the provisions of the 1964–1967 contract.[4]

The arbitrator proceeded to hear the merits of the claim.

A collective bargaining contract between the parties for the period September 1, 1961, to September 1, 1964, contained a provision reading:

"11. In the event of the termination of an employee's employment he shall receive pro rata vacation pay."

Counsel for Capitol introduced the 1964–1967 contract and also the 1961–1964 contract to show the omission of the provision for pro rata vacation pay, contained in the 1961–1964 contract, from the 1964–1967 contract and also introduced evidence of the negotiations between the parties with respect to the 1964–1967 contract to show that the provision was omitted as the result of such negotiations and was intended to relieve Capitol from any obligation to pay pro rata vacation pay. They also contended that the 1964–1967 contract provisions with respect to pro rata vacation pay were not ambiguous. Thus, their position at the hearing before the arbitrator was inconsistent.

At the hearing on the merits, the Union introduced evidence before the arbitrator that the provision contained in the 1961–1964 contract was omitted from the 1964–1967 contract solely to place Capitol in a competitive position among similar meat packers, who were members of the Rocky Mountain Meat Dealers Association, and who did not make pro rata vacation payments to employees who voluntarily quit or were discharged for cause from their employ-

---

3. The annual vacation time for each employee was fixed by Article 28 of the contract by the length of time of his service.

4. Capitol urged that the dispute was not arbitrable, because the Union had not filed a grievance within the time limit fixed by the contract, as required by Article 9 of the 1964–1967 contract. The arbitrator held it was arbitrable and Capitol does not now challenge that decision.

ment, and that such was the sole purpose and intent of Capitol and the Union with respect to the omission of the provision for pro rata vacation pay from the 1964–1967 contract. The Union also introduced evidence that it was not within the contemplation of the parties at the time the 1964–1967 contract was negotiated and entered into that Capitol would close down its plant and go out of business.

The oral evidence introduced before the arbitrator was not taken down by a reporter. The only showing of the purport of such evidence before the lower court was the recitals and findings of the arbitrator.

The arbitrator found:

"The parties agreed not to include the pro rata vacation provision of their previous Agreement in their latest Agreement because no such provision was included in the Rocky Mountain Meat Dealers Association Agreement,"

and that:

" * * * the deletion of the pro rata vacation provision was not made with reference to closure of the plant. Although, in the 1964 negotiations, the Company stressed the need to remain competitive if it was to remain in the business, the Arbitrator does not find that Company's business was threatened or that the parties negotiated in contemplation of a plant closure. Quite to the contrary, the parties appear to have negotiated in the expectation of a subsisting contractual relationship of indefinite duration. The Company bargained for and received Union concessions which the Company indicated would keep it competitive. The Union concentrated on pension rather than severance benefits because the Company insisted it intended to remain in business."

The arbitrator further found:

"* * * it was the intention of the parties to treat vacation benefits as deferred payments for services rendered, a part of the total wage earned by an employee for each day he performed his job in the continuous service of the Company. The fact that the amount of vacation benefits are measured by the employee's length of service is one test * * * to determine that vacation payments are for services rendered. The fact that 'absence during the year for one (1) or more weeks must be made up for the purpose of determining vacation eligibility * * *' clearly indicates that vacation benefits were not intended as a gratuity by the parties. And the fact that 'employees may be allowed to receive vacation pay in lieu of vacations' forces the conclusion that the parties did not intend to provide vacation benefits under the theory that vacations provide needed periods of rest."

and that:

" * * * The parties in this case clearly agreed that an employee of the Company would not be entitled to pro rata vacation payments when his employment was terminated when they did not continue the provision of paragraph 11, Article 20, in their new Agreement, but this would appear only to apply to circumstances in which the employee's conduct caused his termination if the deletion of the provision was to equalize pro rata vacation obligations among the Company and its competitors within the Rocky Mountain Meat Dealers Association. There was no evidence adduced at the hearing to show that dealers within the Rocky Mountain Meat Dealers Association would not be liable for pro rata vacation benefits upon the cessation of business. There was only evidence that these dealers have not and are not obligated to make pro rata vacation payments to employees who voluntarily terminate their employment or are terminated for cause."

The arbitrator further found:

" * * * the employees were literally 'laid off,' retaining seniority under the seniority provision for six months under the terms of the Agree-

ment. They did not voluntarily quit, they were not discharged for cause. * * *"

The arbitrator concluded:

" * * * the employees were entitled to their pro rata vacation pay which had vested in them at the time of the plant closure because nothing in the labor Agreement nor in the circumstances of the layoff defeats the right of the employees to vacation pay earned to the date of layoff." [5]

■ It is settled law that an award of an arbitrator under an arbitration provision in a collective bargaining agreement, which provides the arbitrator's decision shall be final and binding on the parties, is not open to review on the merits. The merits embrace not only asserted errors in determining the credibility of witnesses, the weight to be given their testimony, and the determination of factual issues, but also the construction and application of the collective bargaining agreement, where

the bargaining agreement provides, as here, that "any dispute, disagreement or controversy concerning the interpretation or application of this Agreement may be submitted to arbitration upon the request of either party. The Employer and the Union shall, within five (5) working days after such notice of request to arbitrate, select an impartial arbitrator. to hear and determine the matter in dispute, and the award of such impartial arbitrator shall be final and binding upon the parties."

"And it matters not that this court, if the merits of the award were open to review, might differ with the arbitrator with respect to his findings of fact and might place a different construction on the agreement than did the arbitrator." [6]

In United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, at page 596, 80 S.Ct. 1358, at page 1360, 4 L.Ed.2d 1424, the court said:

"The refusal of courts to review the merits of an arbitration award is the

---

5. In support of his conclusion, the arbitrator quoted from an address of Arbitrator I. Robert Feinberg, in discussing vested rights of employees before the National Academy of Arbitrators at its annual meeting in 1963, in which he said: "It is certain that vacation pay is a right which more often than otherwise survives the expiration of the agreement and 'vests' in the employee as he goes about his chores from day to day. Where a plant has been shut down or the employer has gone out of business and the collective bargaining agreement has been terminated, courts, as well as arbitrators, tend to grant vacation on a pro rata basis for the period during which the employees have served notwithstanding the fact that they may not have met the requirement that they be in the employer's employ on a specific date. In some of these cases arbitrators have * * * rationalized the result by holding that the employees were merely 'laid off' and retained their rights as employees, or have interpreted the eligibility date merely as a 'calculation date.' Labor Arbitration and Industrial Change, BNA, 1963, p. 198. Leon v. Detroit Harvester Co., 363 Mich. 366, 109. N.W.2d 804, 48 LRRM 2883; Textile Workers Union v. Brookside Mills, Inc. [205 Tenn. 394], 326 S.W.2d 671, 46 LRRM 2753;

Livestock Feeds, Inc. v. Local Union of C.I.O., [221 Miss. 492] 73 So.2d 128, 34 LRRM 2433; United States v. Munro-Van Helms Co., 5 Cir., 243 F.2d 10, 39 LRRM 2598; In re Brooklyn Citizen, N.Y., [1 Misc.2d 162] 90 N.Y.Supp.2d 99, 23 LRRM 2429; Kleen-Fibre Corp., 21 LA 234; Tobe Deutschmann Corp., 35 LA 179; Border Queen, Inc., 35 LA 560; Brookford Mills, 28 LA 838; Monument Mills, Inc., 29 LA 400; Rheem Mfg. Co., 29 LA 173; Brooklyn Eagle, Inc., 32 LA 156. See also cases cited in Vacation Rights Under Collective Bargaining Agreements by Walter L. Daykin, 17 Arbitration Journal 34 (1962)."

6. International Brotherhood of Pulp, Sulphite and Paper Mill Workers, Local Union No. 874 v. St. Regis Paper Co., 5 Cir., 362 F.2d 711, 714–715, and cases cited in note 4, page 715; United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424; United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403.

proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards."

And the court, at pages 598 and 599, 80 S.Ct. at pages 1361, 1362 of the opinion in that case, in response to a major argument, as here, that the arbitrator incorrectly interpreted the collective bargaining agreement, said:

" * * * The acceptance of this view would require courts, even under the standard arbitration clause, to review the merits of every construction of the contract. This plenary review by a court of the merits would make meaningless the provisions that the arbitrator's decision is final, for in reality it would almost never be final. * * * It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his."

What we have said with respect to the finality of arbitrators' decisions is in accord with the express policy of Congress, set forth in § 203(d) of the Labor Management Relations Act, 29 U.S.C. § 173(d), which reads in part as follows:

"(d) Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement. * * *"

The holding of the courts in labor dispute cases with respect to the finality of an arbitrator's decision involving the application and interpretation of a collective bargaining agreement is in accord with long established equitable doctrine with respect to arbitration of disputes generally. In Burchell v. Marsh, 17 How. (58 U.S.) 344, 349, 15 L.Ed. 96, the court said:

"Arbitrators are judges chosen by the parties to decide the matters submitted to them, finally and without appeal. As a mode of settling disputes, it should receive every encouragement from courts of equity. If the award is within the submission, and contains the honest decision of the arbitrators, after a full and fair hearing of the parties, a court of equity will not set it aside for error, either in law or in fact. A contrary course would be a substitution of the judgment of the chancellor in place of the judges chosen by the parties, and would make an award the commencement, not the end, of litigation. * * *"

There is no basis in the record before us for a conclusion on our part that the arbitrator in the instant case did not accord the parties a full and fair hearing, or that his decision was not made in good faith or was in any sense arbitrary or capricious.

The judgment is affirmed.